# CAUSE NO. 08-10227

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### THERMACOR PROCESS, L.P.,

**Plaintiff-Appellant**

vs.

### BASF CORPORATION,

**Defendant-Appellee**

**On Appeal from a Final Judgment of the United States District Court
for the Northern District of Texas, Fort Worth Division
USDC NO. 4:06-CV-605 and
Order Overruling Rule 60(b) Motion**

## BRIEF OF APPELLANT, THERMACOR PROCESS, L.P.

STEPHEN L. TATUM
State Bar No. 19674500
J. FRANK KINSEL, JR.
State Bar No. 11488700
JOHN S. POLZER
State Bar No. 24042609
**CANTEY HANGER LLP**
801 Cherry Street, Unit #2, Suite 2100
Fort Worth, Texas 76102
Telephone: (817) 877-2800
Facsimile: (817) 877-2807
**ATTORNEYS FOR
THERMACOR PROCESS, L.P.**

June 2, 2008

# CAUSE NO. 08-10227

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### THERMACOR PROCESS, L.P.,

**Plaintiff-Appellant**

**vs.**

### BASF CORPORATION,

**Defendant-Appellee**

### <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of FED. R. APP. P. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiff/Appellant:      Thermacor Process, L.P.

Appellant's Counsel:      Stephen L. Tatum
                          State Bar No. 19674500
                          J. Frank Kinsel, Jr.
                          State Bar No. 11488700
                          John S. Polzer
                          State Bar No. 24042609
                          **CANTEY HANGER LLP**
                          801 Cherry Street, Unit #2, Suite 2100
                          Fort Worth, Texas  76102
                          Telephone: (817) 877-2800
                          Facsimile:  (817) 877-2807

i

Interested Persons:          Thermacor, L.C.  – General Partner of Appellant

                             Thomas J. Keyes – Appellant's Limited Partner
                             Richard B. Bender – Appellant's Limited Partner
                             Joseph A. Keyes – Appellant's Limited Partner
                             Caroline Kelly – Appellant's Limited Partner
                             Christine Keyes – Appellant's Limited Partner


Defendant/Appellee:          BASF Corporation

Appellee's Counsel:          George Parker Young
                             Thomas J. Williams
                             Josh Borsellino
                             Karen Precella
                             Haynes and Boone, L.L.P.
                             201 Main Street, Suite 2200
                             Fort Worth, Texas 76102



                             _____
                             Stephen L. Tatum
                             Attorney of Record for
                             Thermacor Process, L.P.

## **STATEMENT REGARDING ORAL ARGUMENT**

Oral argument would be helpful to this Court in its disposition of the issues raised by this appeal. The facts are somewhat technical and the District Court's factual basis for its ruling is not supported by the record. Oral argument would assist the Court in determining whether the facts relied upon by the Court were established as a matter of law.

# **TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS ............................................................................... i

STATEMENT REGARDING ORAL ARGUMENT ...................................................................... ii

TABLE OF CONTENTS ............................................................................................................... iii

TABLE OF AUTHORITIES ........................................................................................................... v

RECORD REFERENCES ............................................................................................................. vii

APPENDICES ............................................................................................................................... vii

JURISDICTIONAL STATEMENT ................................................................................................ 1

ISSUES PRESENTED .................................................................................................................... 2

Issue No. 1 ...................................................................................................................................... 2

Did the trial court err when it granted BASF's Motion for Summary Judgment?

Issue No. 1(a) ................................................................................................................................. 2

Has Thermacor provided the Court with competent, sufficient summary judgment evidence on its <u>negligent misrepresentation</u> claim, and did the trial court therefore err when it granted BASF's Motion for Summary Judgment as to that claim?

Issue No. 1(b) ................................................................................................................................. 2

Has Thermacor provided the Court with competent, sufficient summary judgment evidence on its <u>fraudulent inducement</u> claim, and did the trial court therefore err when it granted BASF's Motion for Summary Judgment as to that claim?

Issue No. 1(c) ................................................................................................................................. 3

Has Thermacor provided the Court with competent, sufficient summary judgment evidence on its <u>DTPA</u> claim, and did the trial court therefore err when it granted BASF's Motion for Summary Judgment as to that claim?

Issue No. 2 ....................................................................................................... 3

       Did the trial court err in denying Thermacor's Motion for Relief from Judgment
       when Thermacor exercised due diligence in its attempts to obtain Chris LaCarte's
       deposition?

STATEMENT OF THE CASE ............................................................................ 3

STATEMENT OF FACTS ................................................................................. 4

SUMMARY OF THE ARGUMENT ................................................................. 19

ARGUMENT AND AUTHORITIES .................................................................. 23

    Standard of Review ..................................................................................... 23
    Introduction ................................................................................................ 24
    Negligent Misrepresentation ....................................................................... 35
    Fraudulent Inducement ............................................................................... 43
    DTPA .......................................................................................................... 45
    Motion for Relief from Judgment ............................................................... 46

CONCLUSION ................................................................................................. 51

CERTIFICATE OF COMPLIANCE ................................................................. 52

CERTIFICATE OF SERVICE .......................................................................... 53

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                              **Page**

*Alcan Alum. Corp. v. BASF Corp.,*
  133 F. Supp. 2d 482, 497 (N.D. Tex. 2001) .............................................................. 33

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d. 202 (1988) ..................................... 23

*Beck v. Texas State Board of Dental Examiners,*
  204 F.3d 629, 633 (5th Cir. 2000) ............................................................................ 24

*Breen v. Texas A&M University,*
  485 F.3d 325, 331 (5th Cir. 2007) ............................................................................ 23

*Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.,*
  246 F.3d 1336, 1345 (5th Cir. 2001) ........................................................................ 23

*Federal Land Bank Ass'n of Tyler v. Sloane,*
  825 S.W.2d 439, 442 (Tex. 1991) ............................................................................. 35

*Florida Dept. of Insurance v. Chase Bank of Texas Nat. Ass'n.,*
  274 F.3d 924, 928 (5th Cir. 2001) ............................................................................ 24

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,*
  960 S.W.2d 41, 47 (Tex. 1998) ................................................................................. 43

*Kane v. Nxcess Motorcars, Inc.,*
  2005 Tex. App. LEXIS 1692 (Tex. App.—Houston 2005) ........................................ 30

*Malacara v. Garber,*
  353 F.3d 393, 398 (5th Cir. 2003) ............................................................................ 24

*Provident Life and Accident Ins. Co. v. Goel,*
  274 F.3d 984, 999 (5th Cir. 2001) ............................................................................ 47

*Prudential Ins. Co. of Am. v. Jefferson Assocs.,*
  896 S.W.2d 156, 162 (Tex. 1995) ............................................................................. 31

*Seven Elves, Inc. v. Eskenazi,*
  635 F. 21 396, 402 (5th Cir. 1981). .......................................................................... 50

*Templet v. Hydrochem, Inc.,*
  367 F.3d 473, 477 (5th Cir. 2004) ............................................................................ 23

**Statutes**                                                              **Page**

28 U.S.C. §1291 ..................................................................................... 1

28 U.S.C. §1332 ..................................................................................... 1

TEX. BUS. & COMM. CODE §17.41 ......................................................... 44

TEX. BUS. & COMM. CODE §17.46(b)(5) ................................................. 45

TEX. BUS. & COMM. CODE §17.46(b)(7) ................................................. 45

**Rules**

FED. R. APP. P. 28.2.1 ............................................................................ i

FED. R. APP. P. 32(a)(5) ........................................................................ 52

FED. R. APP. P. 32(a)(7)(B) ................................................................... 52

FED. R. APP. P. 32(a)(7)(B)(iii) ............................................................. 52

FED. R. APP. P. 32(a)(b) ........................................................................ 52

FED. R. CIV. P. 56 .................................................................................. 24

FED. R. CIV. P. 59(b) ........................................................................ 46, 47

FED. R. CIV. P. 6(a). ............................................................................. 47

FED. R. CIV. P. 60(b) ............................................................... 1, 22, 46, 50

FED. R. CIV. P. 60(b)(2) ................................................................... 46, 47

# RECORD REFERENCES

For the Court's convenience, the Clerk's record will be referred to as follows:

| | |
|---|---|
| CR p.__ | Clerk's Record |
| Supp CR p. __ | Supplemental Clerk's Record |
| Op. p. ____ | Memorandum, Opinion and Order dated February 7, 2008 |

# APPENDICES

| | |
|---|---|
| Therm. App. ____ | Thermacor's Appendix of Evidence offered in support of Thermacor's Response to BASF's Motion for Summary Judgment |
| BASF App. ____ | BASF's Appendix, Volume 1 and Volume 2 of Evidence offered in support of its Motion for Summary Judgment |
| Therm. App. Motion For Relief | Thermacor's Appendix of Evidence in Support of Thermacor Process, L.P.'s Motion for Relief from Judgment |

## JURISDICTIONAL STATEMENT

The trial court had jurisdiction over this matter pursuant to 28 U.S.C. §1332 because it involves citizens of different states, and the damages suffered by Thermacor Process, L.P. ("Thermacor") exceeded $75,000.00, exclusive of interest and costs.   Thermacor is a Texas limited partnership, whose general partner, Thermacor, L.P., is a Texas Limited Partnership. Thermacor Process, L.P.'s principal place of business is in Texas and all of its limited partners are Texas residents.

BASF Corporation ("BASF") is a Delaware corporation with its principal place of business in Michigan.   This Court's jurisdiction is based on 28 U.S.C. §1291 because this is an appeal from a final judgment entered on February 7, 2008, by the Honorable John McBryde, District Judge of the United States District Court for the Northern District of Texas (CR2, USCA5 450), and from an Order overruling a Rule 60(b) Motion for Relief from Judgment. FED. R. CIV. P. 60(b) (Supp. CR1, USCA5 11-19).

## ISSUES PRESENTED

### Issue No. 1

Did the trial court err when it granted BASF's Motion for Summary Judgment? (CR2, USCA5 418-434).

### Issue No. 1(a)

Has Thermacor provided the Court with competent, sufficient summary judgment evidence on its <u>negligent misrepresentation</u> claim, and did the trial court therefore err when it granted BASF's Motion for Summary Judgment as to that claim?

### Issue No. 1(b)

Has Thermacor provided the Court with competent, sufficient summary judgment evidence on its <u>fraudulent inducement</u> claim, and did the trial court therefore err when it granted BASF's Motion for Summary Judgment as to that claim?

## Issue No. 1(c)

Has Thermacor provided the Court with competent, sufficient summary judgment evidence on its <u>DTPA</u> claim, and did the trial court therefore err when it granted BASF's Motion for Summary Judgment as to that claim?

## Issue No. 2

Did the trial court err in denying Thermacor's Motion for Relief from Judgment when Thermacor exercised due diligence in its attempts to obtain Chris LaCarte's deposition and when his testimony would have compelled a different result? (Supp CR1, USCA5 11-19).

## STATEMENT OF THE CASE

Thermacor's claims of negligent misrepresentation, fraudulent inducement and violations of the Texas Deceptive Trade Practices Act ("DTPA") (CR1, USCA5 96-120) arose from representations made by BASF in connection with the sale by BASF to Thermacor of a high temperature insulating foam to be used in Thermacor's insulated piping systems. Thermacor's Third Amended Complaint was filed on September 29, 2006 (CR1, USCA5 96-120) and BASF timely answered. On December 6, 2006, BASF filed a Motion to Dismiss, which was denied on February 8, 2007. (CR1, USCA5 121-123; CR1, USCA5 181-183). On

December 11, 2007, BASF filed its Motion for Summary Judgment (CR2, USCA5 227-232), and Thermacor timely responded on January 2, 2008 (CR2, USCA5 294-349). The trial court granted BASF's Motion for Summary Judgment on February 7, 2008. (CR2, USCA5 227-232; CR2, USCA5 418-434). On March 4, 2008, Thermacor filed its Motion for Relief from Judgment, which was denied on March 19, 2008. (Supp. CR1, USCA5 451-457; USCA5 11-19; CR2). Thermacor timely perfected this appeal from both Orders. (CR2, USCA5 479-480; Supp. CR.1, USCA5 23-24).

## STATEMENT OF FACTS

Thermacor is a Fort Worth company founded in 1967 that designs and manufactures pre-insulated pipe systems for use in commercial heating and cooling system applications. These systems transmit steam or chilled water from a central location throughout campuses in pipes insulated by a foam layer and surrounded by a layer of polyethylene. It is a family-owned company that does business almost exclusively in the United States. (*BASF App*. Vol 1, 0044; Keyes, Sr. Depo. 10:2-9).

Thermacor manufactures insulated pipe, consisting of an inner steel pipe approximately six (6) inches in diameter, for example, through which steam or

chilled water flows, a foam insulating layer approximately 2.5 inches thick[1] and an outer polyethylene covering approximately 1/4 inch thick. Thermacor manufactures these products, usually in 40-foot lengths, in one of two ways. Using the "injection method," the steel pipe is suspended in the outer polyethylene jacket and the foam insulation is injected in one end of the length of pipe until it emerges from the opposite end. (CR2, USCA5 303). The foam expands and hardens in place to form the insulating layer. *Id.* Until 2000, the injection method was the only manufacturing method Thermacor used. Thermacor still uses the injection method for a significant portion of its product.

The second method Thermacor uses to make lengths of insulated pipe is the "spray" method. That process begins by moving the steel pipe on a rotating conveyor through a space where the foam insulation is sprayed on the pipe as it moves through. (CR2, USCA5 303). The foam adheres and expands as the pipe is moved into a second area where the polyethylene jacket is applied. This process is more efficient and Thermacor's product can be manufactured more quickly using the "spray" method. (*BASF App.* Vol. 1, 0051; Keyes, Sr., Depo. 17:15-21).

From 1967 to 1995, most applications called for the insulated transmission pipes to run underground between the central heating/cooling unit and the location

---

[1]    The actual size of the inner steel pipe and the surrounding insulation may vary. These dimensions are given to describe the relative size of the components.

5

to be heated or cooled.[2] The maximum design temperature for the fluid transmitted by the system was 250ºF. During this period Thermacor used polyurethane insulating foam developed and sold by BASF, Stepan Company ("Stepan"), and other chemical companies. (BASF App. Vol. I. 0050; Keyes, Sr. Depo. 16:3-5).

In 1995, before Thermacor began using the spray-on manufacturing method, Thermacor investigated the use of polyisocyanurate foam because of a demand for higher temperature systems. (*BASF App.,* Vol. 1, 0215-0217; Keyes, Jr., Depo., 8:14-10:16). Polyisocyanurate foams could withstand higher operating temperatures. At the time, such a product was unprecedented in the industry. As this was a completely new product to Thermacor and the industry in 1995, and because the product was presented by an individual (and not a well-known company such as BASF), Thermacor decided to test the product. Thermacor created models of a system using polyisocyanurate foam insulation consisting of 3' and 6' sections cut from the pipe foam jacket assembly and placed electric heaters inside the pipes which were then filled with oil and sealed both ends (the "hot oil" test). (*Therm. App. 0048*, Keyes, Sr. Depo., Vol. I 43:5-14). Thermacor spent one (1) year evaluating the effects of heated oil up to 420° F on the foam. Thermacor knew that testing for temperature required a long term test over a long period of time. (*BASF App.*, Vol. 1; Keyes, Jr., Depo. 10:3-16).

---

[2]    These systems also transmit chilled water in warm weather. The cooling application is not involved in this controversy.

6

Stepan gave Thermacor its newly developed polyisocyanurate injection foam to evaluate. (*BASF App.,* Vol. 1 0215; Keyes, Jr., Depo. 8:14-25). Thermacor's testing process of Stepan's product and a similar product from a smaller vendor were both expensive and time consuming, but in the end were successful. This was the one and only time that Thermacor ever tested a product for its thermal stability. Thermacor tested for the thermal stability of polyisocyanurate foam product because it was a new, revolutionary product. (*BASF App.*, Vol. 1 0216; Keyes, Jr., Depo. 9:20-10:2). Thermacor buys hundreds of products and has always relied on the producers of those products to test them.

Thermacor selected Stepan as its supplier for polyisocyanurate foam for high temperature systems made using the injection method, because Stepan's formulation was easy to use. (*See,* CR2, USCA5 304).

Before 2000, Thermacor used the injection process exclusively  In 2000, Thermacor decided to invest in equipment which would enable it to spray the insulating foam onto the central steel pipe in a continuous process. (CR2, USCA5 303). Thermacor decided to invest in a spray process because when sufficient footage of straight pipe was required for a particular installation, it was faster and more efficient than the injection process. *Id.* (*Therm. App. 0046,* Keyes, Sr. Depo., Vol. I., 19:16-21).

Thermacor purchased a continuous conveyer spray foam application system from Garneau Co. ("Garneau"), in Edmonton, Alberta, Canada. (*See generally* CR2, USCA5 303). Stepan was unable to supply a foam that would work in the spray application, so Garneau put Thermacor in touch with its supplier, BASF Canada, who referred Thermacor to BASF sales personnel in the United States. (*BASF App.* Vol. I, 0056, Keyes, Sr., Depo. 23:13-25). BASF USA shipped Thermacor a tank-truck load of its <u>polyurethane</u>-based "regular temp" spray foam product from Canada to be used with Garneau's system. (CR2, USCA5 304). John Williams ("Williams"), a BASF sales representative (*BASF App.*, Vol. 1 0257; Williams Depo. 12:1-9), and Ron Patterson ("Patterson"), a BASF process engineer (*BASF App.* Vol. 1, 0245; Patterson Depo. 6:2-3), came to Thermacor's plant to test the polyurethane spray foam application using Thermacor's spray equipment. The application test showed that BASF's product would work with Thermacor's application system, and Williams, of BASF, became a very frequent visitor to Thermacor's plant as they were now a new client of BASF.    (CR2, USCA5 312).

Thereafter, Thermacor utilized BASF's low-temp spray product and had no complaints. (USCA5 304).

While not looking to supplant its injection product, Thermacor decided to try a high-temp spray foam proposed by Stepan. Being able to produce both high-

temp and low-temp pipe insulation on the spray equipment allowed Thermacor to utilize the spray system for more jobs. The injection process will always be an important part of Thermacor's business because the spray process is most effective only when it produced long, straight pipes. (*Therm. App.* 0035; Keyes, Jr., Depo. 48:10-25).

Around January of 2004, John Williams of BASF came to Thermacor and spoke with Joe Keyes, Sr., CEO of Thermacor, and requested that BASF be allowed to bid for Thermacor's injected foam business. (CR2, USCA5 303).

BASF sought to increase its sales to Thermacor by offering a spray-on foam for Thermacor's high temperature application. (*Therm. App.* 0003; Patterson Depo., 40:8-13). Joe Keyes, Sr. explained to John Williams that since BASF did not have a high-temp spray-on system capable to withstand continuous operating temperature of 366°F with spikes to 400°F, Thermacor would not consider BASF for any of Thermacor's injection business.

Williams realized he could not replace Stepan for Thermacor's high-temp injection business so he focused on Thermacor's high-temp spray business. Thermacor was interested in Williams' offer to provide Thermacor with a high-temp spray product because Thermacor was having trouble applying Stepan's high-temp spray product to pipes.

9

Williams offered to develop a high-temp spray and injection foam so BASF could bid on Thermacor's injection business, which Joe Keyes Sr. had previously resisted because BASF did not offer a high temperature spray-on foam. Thermacor told John Williams that Thermacor needed a minimum temperature of 400°F, in order to allow Thermacor's 366°F product a safety factor. (*Therm. App.* 0043, 0045; Keyes, Sr. Depo. Vol. 1, 12:3-10; 14:16-20).

After that conversation, Williams approached Brian Hyduk ("Hyduk"), a BASF technical manager, and Patterson regarding Thermacor's need for 400°F spray foam. Hyduk called Chris LaCarte ("LaCarte"), BASF's Western Technical Manager (*Therm. App.* 0005, Patterson Depo. 44:14-25) in Canada, requesting LaCarte's highest temp spray formulation. LaCarte sent his formulation to the BASF lab to be tested (*Therm. App.* 0012, Patterson Depo. 77:11-24), using two tests; the DMA (Dynamic Mechanical Analysis) test and a TGA (Thermgravimetric Analysis) test. (*Therm. App.* 0014, Patterson Depo. 79:6-16). These tests, as explained by the BASF Power Point presentation, show the temperature at which a foam begins to show "an onset of a softening transition" (*BASF App.* Vol. II, 0490-0497). Essentially, the Power Point and BASF representatives purported that the DMA graph shows at what temperature the foam becomes unstable and softens. *Id.* What was never mentioned or even implied was that this test yielded a softening point that was only stable for a matter of hours.

10

Unbeknownst to LaCarte, Patterson, Williams and Thermacor, Raghu Gummaraju ("Gummaraju"), the PHD chemist who ran the BASF lab (CR2, USCA5 355), had recently changed the method that the DMA tests were run -- shortening the intervals at which heat applied to a foam sample was raised from 1°C/min to 5°C/min. (*Therm. App.*, Motion for Relief 0156; Gummaraju Depo. 123:10-15). This has the advantage of a 500% increase in efficiency for his lab on these tests, but as Gummaraju testified, it changes the DMA resulting data to make the foam appear to soften at a higher temperature. *Id.*

Approximately four months after the Williams meeting with Joe Keyes, Sr. about the spray-on foam product, John Williams sent Joe Keyes, Jr. the following e-mail, unequivocally confirming the successful development of a high-temp spray foam:

> Hello Joe,
>
> In my last conversation with your Dad [Keyes, Sr.], he indicated that [defendant] should pursue the Hi-Temp spray. It is done, please find tech data sheet attached. Please ask James Filer if one drum of Resin will be enough for the trial.
>
> (continued . . .)

Williams' attached graphs had a distinct "call-out" box at 394°F where the foam started to soften, clearly indicating that the foam would remain stable within

Thermacor's specifications. (*Therm App.* 0202-0207; *BASF App.* Vol. I, 0073; Keyes, Sr., Depo. 60:9-17).

Notwithstanding that it was not BASF's practice to give its customers data sheets, BASF had previously provided Thermacor with a Power Point presentation explaining the TGA and DMA graphs. (*Therm. App.* 0097; *BASF App. Vol. 2,* 0495; Hyduk Depo. 117:23-118:2). To laypersons like Thermacor personnel, the Power Point presentation appeared to corroborate what the graphs (and "call-out" boxes) clearly showed, *i.e.,* that the foam would begin to degrade at a high enough temperature to satisfy Thermacor's specifications. (*BASF App.* Vol. I., 0072; Keyes, Sr. Depo. 60:9-17). The unequivocal, unconditional e-mail, the "call-out" boxes and the Power Point presentation all led Thermacor personnel to conclude that BASF was providing a foam that met Thermacor's temperature requirements. *Id.*

Williams and Patterson always attended customer application tests of BASF materials to supervise and observe how the material runs with a customer's equipment. Patterson claimed, in his deposition, that his expertise was in his knowledge of how to run the various types of foam applications on the customer's equipment. Patterson was not a chemist and had no knowledge about the formulation design. (*Therm App.* 013 and 278; Patterson Depo. 78:3-22).

Thermacor would never have agreed to test the BASF high-temp formulation for application if it did not believe that it was stable up to 394°F, as BASF indicated on the graphs it sent. (*BASF App*. Vol. I., 0068; Keyes, Sr., Depo. 54:17-21). Application testing of a new formulation involved a test of how the spray foam worked in Thermacor's spray system, and it usually took about two days at an out-of-pocket cost for Thermacor of $10,000.00. After the application tests were initially successful, Thermacor purchased and started making products using BASF High-temp, spray-on foam (Product #17071).

Thermacor quickly manufactured and provided for installation of several heating/cooling systems using BASF high-temp spray foam products. During the installation process at Alcon Laboratories in Fort Worth after a portion of the system had been put into operation, before it was buried, a contractor noticed a soft spot on a pipe. (CR2, USCA5 308). An investigation revealed that the BASF foam (Product #17071) had deteriorated, jeopardizing the integrity of the system. (*BASF App.,* Vol. I., 0122; Keyes, Sr. Depo., Vol. I., 169:2-15). Investigations at other sites where the BASF product was used revealed that the foam was also failing within months after installation. (*BASF App.*, Vol. I., 0133, Keyes, Sr., Depo. 189:16-20).

Fortunately for Thermacor, Alcon had not yet buried the system due to their urgent need for energy. This was a very unusual practice, but it allowed for the

13

discovery of the problem, which in all likelihood would not have otherwise been detected for potentially many more months to years resulting in hundreds of millions of dollars of required replacements.

Once Thermacor discovered that problems existed with the BASF product, it informed BASF. (CR2, USCA5 308). Instead of acting quicker to help with damage control and acknowledging what was, at best, a communications problem between Raghu Gummaraju and its sales staff, BASF tried to blame the failures on Thermacor's quality control, the type of cyclopentane that Thermacor used, and other application issues, such as head pressure etc. (*BASF App.*, Vol. I., 0122; Keyes, Sr., Depo. 169-2-6). These red herrings aside, BASF never asked Thermacor if it [Thermacor] had tested for temperature. Only after this dispute arose did BASF begin to state a new story, *i.e.,* that it did not rate foam for temperature, notwithstanding its employees' admissions and representations to the contrary. (*Therm. App.* 0110; Williams Depo., 92:5-7).

Thermacor's post-failure heat testing methods were very time consuming. Thermacor researched to find the testing protocol that the chemical industry used and conducted its own tests. (*BASF App.*, Vol. 1 0122; Keyes, Sr. Depo. 169:6-23). The test method used was to put cubes of foam in an industrial oven and measure them over a period of thirty (30) days at a constant temperature for change in volume called "Dimensional Stability". Thermacor purchased four (4) ovens and

14

tested the BASF high-temp formulations with both the purer cyclopentane, and the less pure one, plus the BASF standard spray foam. Thermacor determined that the standard spray foam failed at around 280°F. (*BASF App.*, Vol. 1 0122; Keyes Sr., Depo. 169:6-23). The BASF high-temp, with both types of cyclopentane, appeared to have a slightly higher failure temperature, possibly 290°F.

In the Spring of 2007, after this suit was filed, the parties and their attorneys met in person at the offices of Plaintiff's counsel to discuss settlement and discovery. (CR2, USCA5 461). At that point, the parties discussed taking depositions of the main fact witnesses in the case, as well as exchanging written discovery and then proceeding to mediation. *Id.* Only if mediation was unsuccessful would the parties enter into a "second round" of depositions. *Id.*

On July 9, 2007, Thermacor, through counsel, requested by written correspondence, the depositions of John Williams ("Williams"), Ronald Patterson ("Patterson"), Christopher LaCarte ("LaCarte"), a BASF corporate representative with knowledge of marketing high temperature foam products, and a BASF corporate representative with knowledge of the research and development of the high temperature foam sold to Thermacor. *Id.*

In September through early November, 2007, the parties took depositions of what the parties believed to be the main fact witnesses in the case. (CR2, USCA5 462).

Specifically, BASF produced John Williams (November 2, 2007), Ron Patterson (October 31, 2007) and Brian Hyduk (November 1, 2007). *Id.* However, notwithstanding the July request for LaCarte, BASF informed Thermacor that LaCarte would not have much relevant knowledge. *Id.*

The parties mediated the case on December 4, 2007. *Id.* At the mediation, when it became apparent that the case would not settle, Thermacor renewed its request for the deposition of Chris LaCarte, as well as BASF Ph.D, Raghu Gummaraju ("Gummaraju"). Thermacor followed up with a request for these depositions by e-mail to BASF's counsel on December 7, 2007.

On December 11, 2007, BASF filed its Motion for Summary Judgment. Due to the holidays, BASF agreed to produce Gummaraju before Thermacor's deadline to respond to the Motion for Summary Judgment or in the alternative, consented to allowing Thermacor to file a Motion for Leave to include Gummaraju's testimony. Gummaraju's deposition was taken on January 3, 2008, in Detroit, Michigan.

Despite the filing of its response without the aid of LaCarte's testimony, BASF finally produced LaCarte on February 6, 2008, in Calgary, Ontario, Canada. LaCarte's deposition provided many facts about the development of the high temperature foam and the use of the TGA or DMA graphs, which were in direct conflict with the sworn testimony of Williams, Gummaraju and Patterson.

16

LaCarte's testimony was in direct conflict with prior BASF testimony on the subjects of formulation, the existence of a high-temp spray foam prior to the time of BASF's sale to Thermacor, and the use of the DMA and TGA graphs sent to Thermacor.

Williams testified he "brought [LaCarte] in" to help formulate the foam for Thermacor because no one in the U.S. had LaCarte's expertise with this type of product. (CR2, USCA5 464). Patterson corroborated LaCarte's alleged involvement by testifying that LaCarte was involved in formulating the high-temp spray foam sold to Thermacor. (CR2, USCA5 465). However, LaCarte unequivocally testified he had no involvement in the formulation of the high-temp spray foam sold to Thermacor and that he had never even talked to anyone at BASF about high-temp spray foam sold to Thermacor. (CR2, USCA5 464).

LaCarte's testimony also called in question whether or not BASF had a high-temp spray foam in existence (and therefore if it was truly a "novel" product as found by the trial court) at the time the high-temp spray foam was formulated and sold to Thermacor. Patterson testified, as of January 2004 when BASF was beginning to market a high-temp spray foam to Thermacor, that BASF had a Canadian version of a high-temp spray foam. (CR2, USCA5 466). Patterson testified it was this Canadian foam that was tested and sold to Thermacor. (CR2, USCA5 467). While the name was changed to "Americanize" it, Patterson testified

17

there was "no difference between the two systems." *Id.* On the other hand, LaCarte testified BASF Canada did not have a high-temp spray foam which could meet Thermacor's requirements. (CR2, USCA5 468).

LaCarte also admitted that he used the DMA and TGA graphs to rate a foam for temperature at 140°C. (CR2, USCA5 470). It was these same types of graphs which rated the foam for temperature (call out boxes at 394°F) sold to Thermacor and which were attached to Williams email to Thermacor telling Thermacor "it is done." (*Therm. App.* 0202-0207). LaCarte's testimony about the use of the graphs within BASF was in direct conflict with Patterson and Gummaraju's testimony that the DMA and TGA graphs were essentially useless in rating a foam for temperature. (CR2, USCA5 470-71).

On February 7, 2008, one (1) day after the LaCarte deposition was taken, but before the transcript was sent to Thermacor, the Court granted BASF's Motion for Summary Judgment in its entirety and signed a Final Judgment, disposing of the case.

Despite numerous requests and its best efforts in communicating with the Canadian court reporter who transcribed LaCarte's deposition, Thermacor was not able to obtain a copy of LaCarte's transcript until February 28, 2008, a date after Thermacor's deadline to file a Motion for New Trial had passed.

## SUMMARY OF THE ARGUMENT

From the depositions of the five (5) BASF employees the following can be concluded. Hyduk and Patterson's area of expertise was their knowledge of the various types of equipment to mix foams in their many types of applications. They were not chemists and had no expertise in designing formulations, yet they took it upon themselves to design the 400°F foam system Thermacor based on the DMA and TGA graphs.

Gummaraju was a recently hired PhD chemist, but was not consulted by Hyduk on how to design the 400°F system, but only asked to perform the DMA and TGA tests on the samples Hyduk gave him. Gummaraju did so, but he changed the methodology from 5 min/C° to 1 min/C°, which had the effect of shifting the apparent temperature softening point to a much higher temperature. His change was not noted on the graph, nor was it communicated to Williams, Patterson or Thermacor.

LaCarte, who was deposed in Canada, believed that the DMA and TGA graphs represented the true temperature softening point and he also intimated that he worked through Hyduk to get the tests done and at the time Hyduk also believed in the DMA and TGA results.

Williams was a very knowledgeable salesman.  He had spent many days at Thermacor.  He knew very well that to get a chance at obtaining Thermacor's injection business he had to have a 400°F foam.

BASF would like the Court to believe that it was just a misunderstanding on who should test the foam for temperature, and that it was clearly up to Thermacor to test.  The fact is that it was a mistake and a cover up by BASF employees.

Gummaraju led Hyduk and Patterson to believe that they had a 390°F high-temp foam and had Williams send Thermacor that famous e-mail.  At some point they all realized their mistake and instead of admitting it and advancing damage control, they did a cover up.

Based on the story that the facts adduced above supports the trial court erred when it granted BASF's summary judgment.

First, there is more than sufficient evidence to support a jury verdict in Thermacor's favor on the negligent misrepresentation claim.   BASF sales personnel stated that the company's attempt to create a high-temp, spray application foam was "done.", and they supported that statement by attaching data sheets that purported to show that the newly developed foam would remain stable in the temperature range that Thermacor required.

In fact, the data sheets were not supposed to be provided to Thermacor, BASF told its sales staff not to refer to the product in question as "high-temp", and

the test results shown on the data supplied by BASF to its sales staff and customers were delivered from lab tests in which the protocol had been changed in a manner that made the material appear to be more heat-resistant than it actually was.

Thus, BASF's scientific personnel negligently misrepresented test data to the sales staff, who negligently provided it to Thermacor in the course of BASF's business, which relied upon it to its detriment.

Second, there was evidence that BASF was aware that it could not make a product that met Thermacor's needs. Specifically, BASF instructed its personnel not to tout any product, and specifically the product Thermacor bought, as "high-temp." That alone indicates an awareness by BASF that what it could produce would likely not work in a high-temperature application.

Similarly, there is more than sufficient evidence to support a jury verdict in favor of Thermacor on the Texas Deceptive Trade Practices Act claim. By announcing, with knowledge, of the temperature resistance Thermacor needed that "it is done.", and by submitting test data that showed a thermal stability that Thermacor required, BASF, though its employees, made representations about the characteristics, qualities, grade and quality of the insulating foam, that it did not have. The trial court erred when it determined that there was no evidence to support that claim.

Finally, the Court erred in overruling the FED. R. CIV. P. 60(b) motion because Thermacor carried its burden under the Rule. First, the record demonstrates that the evidence in question, the deposition of Christopher LaCarte had been sought for months and was taken only one or two days before the summary judgment was granted. Diligence was shown. Second, Thermacor requested the transcript on an expedited basis and despite its best efforts, it was not produced in time to submit it as newly discovered evidence in support of a Motion for New Trial, which would have required such evidence (the transcript) and not merely the recollection of counsel about the exact nature of the testimony. Thus, Thermacor demonstrated that the evidence was diligently sought and was unavailable before the Motion for New Trial was due, ten (10) days after the judgment.

Finally, Thermacor demonstrated that the evidence would have at least prevented the entry of a summary judgment. Contrary to the testimony of Williams and Patterson, and contrary to the trial court's finding, LaCarte denied being the high-temp foam expert and denied having anything to do with the development of the BASF #17071 product. That testimony also created a fact issue regarding whether Williams and Patterson had any basis for the representations they made to Thermacor about the heat resistance of the product.

For the reasons outlined above, the judgment of the District Court should be reversed and the case should be remanded for trial.

## **ARGUMENT AND AUTHORITIES**

### **Standard of Review**

The District Court granted BASF's Motion for Summary Judgment. That motion asserted both "traditional" and "no evidence" grounds. In general, summary judgments are reviewed *de novo*, and the Court of Appeals draws all reasonable factual inferences in favor of the non-movant. *Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.*, 246 F.3d 1336, 1345 (5th Cir. 2001). This Court also applies the same standard as the District Court to its review of the motion. *Templet v. Hydrochem, Inc.*, 367 F.3d 473, 477 (5th Cir. 2004).

If the moving party meets its initial burden of establishing that there are no issues of material fact and that it is entitled to judgment, the burden shifts to the non-movant to offer evidence showing that issues of material fact exist. *Breen v. Texas A&M University*, 485 F.3d 325, 331 (5th Cir. 2007). Such issues exist when "the evidence is such that a reasonable jury could return a verdict for the non-movant." *Templet,* 367 F.3d at 477; *See also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1988).

23

A no-evidence motion for summary judgment under FED. R. CIV. P. 56 is evaluated similarly. The movant's initial burden is to point out the absence of evidence supporting one or more elements of the non-movant's claim. *E.g., Malacara v. Garber,* 353 F.3d 393, 398 (5th Cir. 2003). After doing so, after giving credibility to all of the non-movant's evidence, and after indulging all reasonable inferences in favor of the non-movant, there is sufficient evidence on each element of Plaintiff's claim to submit the case to the jury, summary judgment is improper. *e.g., Florida Dept. of Insurance v. Chase Bank of Texas Nat. Ass'n.,* 274 F.3d 924, 928 (5th Cir. 2001); *Beck v. Texas State Board of Dental Examiners,* 204 F.3d 629, 633 (5th Cir. 2000).

## **Introduction**

Thermacor was looking for a way to make its manufacturing process more efficient. BASF was looking for a customer. While Thermacor made its needs clearly known to BASF sales personnel, BASF never told Thermacor that its Product, #17071, a spray-on insulating foam, would not retain its stability at the temperatures Thermacor needed. While that may have been the result of negligent miscommunication between BASF's scientific staff and its sales force, resulting in a negligent misrepresentation to Thermacor regarding the qualities of the BASF Product #17071 spray-on high temperature insulating foam, BASF's subsequent

failure to inform Thermacor of its mistake and its attempts to lay the responsibility for the production on Thermacor's production methods (rather than acknowledging the inherent problem with the foam product) caused Thermacor to continue to use the foam to its ultimate detriment and the detriment of its customers, when it could have been looking for other options.

The trial court erroneously granted BASF's Motion for Summary Judgment, in part, by finding as established facts that were either disputed or were absent from the record. This brief is organized around and responds to the trial court's analysis of the issues forming the basis of the Summary Judgment. (CR2, USCA5 418-434). In short, this case should be remanded for trial.

Certain "established" facts found by the trial court are used as a basis for granting summary judgment on each of Thermacor's three (3) causes of action. *See,* Op. at p. 9 (considering "each of plaintiff's theories...in the context of the foregoing established facts") (emphasis added). The following evidence offered by Thermacor relates to each of the additional points of error discussed below in Issues 1(A)-1(C).

Throughout the trial court's opinion there are references to the following subjects: (1) the immediacy of Thermacor's need for BASF's high temperature spray product based on an upcoming regulatory ban; (2) the conditional nature of the promises made by BASF to Thermacor about the suitability of its high-temp

25

spray product; (3) the responsibility to test the product for temperature resistance;
(4) the status of the parties as joint venturers who were going to develop this
product together through trial and error (5) the effect of the boilerplate disclaimers
on Thermacor's alleged obligation to test. Fact issues exist regarding all of those
elements but the last. Not even BASF contends that it and Thermacor were joint
venturers in the development of Product #17071.

**1.     Thermacor had no "urgent" need for the high-temp spray
product because the 141b was unrelated to Thermacor's decision to purchase
a high-temp spray foam.**

There is apparently a substantial misunderstanding by the trial court as to
why Thermacor desired the high-temp spray product. The trial court found that
"[i]n 2004, [Thermacor] was in urgent need of a product with which it could
insulate the high-temperature steel piping it installed for its customers." *See,* Op.
at 5-6. (CR2, USCA5 422-423). However, based on the testimony in the summary
judgment record this is not true. It appears the trial court erroneously reached this
conclusion based on an unsupported assertion (no record references or any
citations) made by BASF in its Brief. *See,* BASF Brief, at p.1, (stating, "[a]t the
end of 2004, Thermacor an immediate need for a product that did not exist.").

BASF attempted to link Thermacor's desire for a high-temp spray product
with an EPA regulatory ban on a blowing agent referred to as 141b. However, the

26

two events, (1) Thermacor's desire for a high-temp spray product, and (2) the approaching regulatory ban on 141b were not related to each other.

Thermacor desired both regular and high-temp spray products which it could utilize with its spray equipment because the spray (as opposed to injection) application was more efficient. (*BASF App.*, Vol. 1, 0052; Keyes, Sr. Depo., Vol. 1 19:16-21). However, a high-temp spray product was more of an extra to supplement its high-temp injection business. (*Therm. App.* 0035; Keyes, Jr., Depo. 48:10-16). As Keyes, Jr. testified, "you can never totally replace injection" and it is injection foam that is the majority of Thermacor's high-temp business. *See, id.*

The regulatory ban on 141b affected all Thermacor's products which utilized that material, including its injection foam. Keyes, Sr. unequivocally answered "no" to the question as to whether the 141b ban was one of the reasons Thermacor was searching for a high-temp spray product. (*BASF App.*, Vol., 0053; Keyes, Sr. Depo., Vol. 1 20:9-24). With or without BASF's high-temp spray, Thermacor had to replace all products using 141b. (*BASF App.*, Vol. 1, 0054;Keyes, Sr., Depo., Vol. 1 21:1-3; *Therm. App.* 0160).

It is clear that Thermacor desired a high-temp spray product so that it could further utilize its investment in its spray equipment. However, the timing and decision to purchase the high-temp spray product from BASF had nothing to do with the regulatory ban on 141b and Thermacor had no urgent need to so. The trial

27

court erred in framing its decision based on that finding.  At best, a fact issue existed regarding Thermacor's need for the high-temp spray foam that should preclude summary judgment.  Further, there is no connection drawn or supported between the need for a new blowing agent and Thermacor's reliance on BASF to provide accurate data about a product it developed.  Even if the urgency of the need for a new blowing agent were established, which it was not, that fact would not provide BASF with a defense.

**2.     BASF represented to Thermacor that "it was done" and BASF had developed a product that met Thermacor's temperature requirements.**

The trial court goes to great lengths to base its opinion on what BASF was trying to do.  The trial court wrote:

> In June 2004, [BASF] informed [Thermacor] that it had done as the official requested (i.e. tried to develop a product that would satisfy [Thermacor's] high temperature foam insulation needs); and, [BASF] sent [Thermacor] data pertaining to the product it had developed, the 17070 product.

Op. at p. 6.  (CR2, USCA5 423).  The trial court added the "i.e. tried to develop" section when no such condition was placed on BASF's development of the high-temp spray product. *Id.* As the record indicated, BASF learned Thermacor's requirements, studied and formulated for months, culminating in the email "it is done."  (USCA5 309-310; *Therm. App.* 0202).  BASF did not represent to Thermacor that it was "trying" to develop the foam, neither did it represent that it

28

thought the foam "might" work. *Id.* BASF's representations, both in the e-mail and in the attached graphs, were unequivocal and certain. *Id.* Thus, to the extent that those statements were incorrect, a fact issue exists as to whether the statements were knowing misrepresentations or negligent misstatements, and summary judgment was improper. BASF told Thermacor that it had in fact done it. *See, id.*

Further evidence that BASF was representing that development of the high-temp spray foam was "done," as opposed to being a work in progress, are the graphs which were supplied with the "it is done" email. (*Therm. App.* 0202-0207). The graphs had specific "call out" boxes which identified the temperature at which the foam began to soften. *Id.* There was no representation that this is what BASF had tried to do, but in fact these graphs were transmitted with the unconditional representation that it was done. (*Therm. App.* 0077; Bender Depo. Vol. 1 56:6-7).

### 3.    Thermacor was never told to test for temperature.

One of the cornerstone <u>fact</u> issues of this case is which party had the responsibility to test for temperature. The trial court concludes:

- "[h]owever rather than to complete testing, plaintiff chose to go forward with a product of defendant, the 17071 product, without first testing at all." Op. at. pp. 7-8. (CR2, USCA5 424-25).

- "Both parties expected plaintiff to satisfy itself from its testing whether the product supplied by defendant would satisfy plaintiff's high-temperature needs." Op. at p. 8. (CR2, USCA5 425).

There are clear fact issues regarding which party was obligated to test and what party assumed responsibility for what type of test.

Thermacor purchased the high-temp spray product from BASF because BASF represented to Thermacor that it had developed a product that met Thermacor's temperature resistance <u>and</u> application requirements. (*Therm. App.* 0039; Keyes, Jr., Depo. 63:-5-8); *Therm. App.* 0074; Bender Depo. Vol. 1 48:2-15). At the basis for its assertion that testing was Thermacor's responsibility, BASF relies not on the testimony, emails or other written communications of its employees, but on the boilerplate disclaimers found it is purchase orders and terms and conditions which were not furnished until <u>after</u> the application testing was done at Thermacor and not until <u>after</u> Thermacor decided to purchase the high-temp spray foam from BASF. (CR2, USCA5 270, 280). Although BASF employees remained in almost constant e-mail communication with Thermacor personnel, however, the record is devoid of any communication in which BASF tells Thermacor to test for temperature. (*Therm. App.* 0015, Patterson Depo. 93:16-21).

BASF's reliance on boilerplate documents does not resolve fact issues as to whether Thermacor was ever told to or assumed the responsibility to test for temperature <u>before</u> the purchase orders were sent. (CR2, USCA5 329). *See, Kane v. Nxcess Motorcars, Inc.,* 2005 Tex. App. LEXIS 1692 (Tex. App.—Houston

2005, not designated for publication) (finding disclaimers <u>could not form basis for the bargain</u> because there was "no evidence in the record that the 'as is' provision <u>was discussed during negotiations</u>," *citing, Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 162 (Tex. 1995) (emphasis added). (*Therm. App.* 0039; Keyes, Jr., Depo. 63:-28) (Keyes, Jr. testifying, "I guess the source of the doubt [as to whether the boilerplate term tells Thermacor to test for temperature] would be they – they're telling you one thing and then telling you another in the written thing. You know, just tend to believe they say, well, <u>here's a high-temp foam and its 360 degrees; and I tend to believe that</u>") (emphasis added).

Certainly a company like Thermacor has no interest in putting an untested product in the ground which would (and has) cost it millions of dollars in replacement cost. Thermacor was never told to test for temperature. (*Therm. App.* 0074; Bender Depo., Vol. 1 48:2-6) (Bender testifies, "We had no reason to doubt the largest chemical company in the world would give us a piece of literature that was, in fact, not thoroughly checked out with respect to temperature limitations").

**4.    The development and formulation of the high-temp spray foam was not the effort of joint venturers, BASF is a manufacturer of foam, Thermacor is a manufacturer who purchases and utilizes products from suppliers such as BASF.**

The trial court found that:

> The summary judgment record establishes as a matter of law that the development of a product that would satisfy [Thermacor's] needs was something in the nature of a joint endeavor between [Thermacor] and [BASF], with [BASF] undertaking to develop such a product and with [Thermacor] making whatever tests were appropriate to ensure itself that the product in fact met [Thermacor's] needs.

Op. at p. 12. (CR2, USCA5 446). Even BASF did not argue that this was "something in the nature of a joint endeavor." This is a supplier/purchaser relationship. BASF touts itself as the "Chemical Company," Thermacor purchases product (like it does from many other suppliers) to use in the manufacture of pre-insulating piping systems. (*BASF App.,* Vol. II 0343). The issue this raises is who had the responsibility to test for heat stability. Joint venturers might be seen as sharing that responsibility. A customer purchasing a product made for that customer by a manufacturer that knows what the customer's requirements were, clearly would not be deemed to have that responsibility absent some specific agreement. Thus, to the extent that the District Court believed that the fictitious "joint venture" obligated Thermacor to test for temperature stability, that belief, and the summary judgment based on that belief was erroneous and should be overruled.

**5.    The boilerplate language in the terms and conditions and purchase order do not impute knowledge on Thermacor because they were**

**not part of the basis of the bargain and are not enforceable based on the misrepresentations made by BASF.**

Rather than pointing to any e-mail or other BASF communication to Thermacor (they were commonly exchanged between the parties) or any testimony by BASF, the trial court relies on boilerplate language in the TPDS and the boilerplate language in BASF's Terms and Conditions. *See,* Op. at p. 8. (CR2, USCA5 425). The boilerplate language in the TPDS has been held to be insufficient as a matter of law and therefore has no effect. *Alcan Alum. Corp. v. BASF Corp.,* 133 F. Supp. 2d 482, 497 (N.D. Tex. 2001).

The purchase orders, which were made subject to the terms and conditions, were not presented to Thermacor until <u>after</u> Thermacor decided to purchase the high-temp spray product. Before this document ever came into Thermacor's hands:

1. Thermacor had told BASF what it required; (CR2, USCA5 310);

2. BASF supposedly worked for months to formulate a foam to meet its requirements (CR2, USCA5 309-3);

3. BASF calibrated Thermacor's equipment and tested the product for application (*see,* CR2, USCA5 307); and

4. Thermacor decided to purchase the product and so informed BASF (CR2, USCA5 304).

Thermacor would not have wasted time testing the foam for its compatibility with Thermacor's application system had it known the most important characteristic of the foam, its thermal stability, was not up to Thermacor's specifications, or had it been told that the thermal stability of the product was untested or uncertain. As Keyes, Jr. testified, the thermal stability is inherent within the foam. (*Therm. App.* 0036; Keyes, Jr., Depo. 51:9-10). Without the threshold issue of thermal stability resolved, there is no conceivable business reason why Thermacor would invest so much of its time and money determining whether or not the foam would apply (*i.e.*, test for application) correctly.

BASF's Williams was a frequent visitor to Thermacor and having to rely on boilerplate disclaimers is instructive. (*See,* CR2, USCA5 312, Williams' visits chart). Williams easily could have told Thermacor to test for temperature during one of those visits, and a fact issues exists regarding whether he did. (*BASF App.* Vol. 1, 0280; Williams Depo. 229:1-3 – [*Williams says he did*] – *BASF App.*, Vol. 1 0087; Keyes, Jr., Depo. 82:16-25 – [*Keyes says he did not*]). That issue frankly effects the propriety of summary judgment on every claim Thermacor brought. BASF could have easily told Thermacor it had no idea what the foam's thermal stability was, however, it did not. All BASF said was "it is done." (*Therm. App.* 0202-0207). All of these facts were disputed and the disputes were supported by

34

evidence on both sides, except for the "joint venturer" finding, which neither side claims is established.

The fact disputes outlined above demonstrate that (1) there is evidence sufficient to support a verdict in favor of Thermacor on all of its claims, and (2) that none of BASF's defenses are established as a matter of law. Thus, summary judgment was improper and should be reversed as to each of the following claims.

## **Negligent Misrepresentation**

The elements for a negligent misrepresentation claim under Texas law are as follows:

> (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex. 1991).

The Court found:

> There is no evidence in the summary judgment record that defendant supplied false information for the guidance of plaintiff in its business or that defendant <u>failed to exercise reasonable care or competence in obtaining or communicating</u> whatever information it communicated to plaintiff concerning defendant's product."

Op. at p. 11 (CR2, USCA5 428) (emphasis added).

There is evidence that BASF supplied false information for the guidance of Thermacor. BASF supplied Thermacor with data sheets (including the TGA and DMA graphs) which appeared to show that BASF's high-temperature spray foams would work to about 200.92 Centigrade. (*Therm. App.* 0070; Bender Depo., 40:13-17; *Therm. App.* 0071; Bender Depo., 43:20-23). However, based on BASF's own admissions, this information was false. (*Therm. App.* 0091; Hyduk Depo. 78:5-25). Thermacor did not learn until the depositions in this lawsuit that, in fact, the DMA and TGA graphs could not be used to determine the foam temperature resistance. *See, Id.*

There was adequate summary judgment evidence that BASF was not competent to develop product that met Thermacor's specifications. The fact that BASF told its sales personnel (1) not to distribute the graphs of the TGA and DMA tests results, and (2) not to refer to the BASF product in question as "high-temp", is enough to get to a jury on the question of whether BASF believed it could make a foam that remained stable at sustained operating temperatures of 360°F up to 400°F. That Williams represented to Thermacor that BASF could make such a product based on information (the TGA and DMA graphs) that he did not understand, is a negligent misrepresentation of BASF's product development capability.

Further, because BASF's testing labs had changed the test parameters without telling anyone, the graphs were misleading regarding the temperatures at which the foam began to break down. (*Therm. App.* Motion for Relief 0156; Gummaraju Depo. 123:10-15). However, at the time BASF was attempting to sell the high-temp foam to Thermacor it never told them of the uselessness of the graphs, nor did BASF sales personnel inform Thermacor that the graphs were based on tests run at quicker intervals (*see id.),* the effect of which was to make the #17071 substance appear stable at higher temperatures than it actually was. Instead, the graphs were presented as evidence of the foam's thermal stability at Thermacor's required temperatures. (*Therm. App.* 0202-0207). Furthermore as testified by BASF's Western Technical Sales Manager LaCarte, there is substantial confusion within BASF as to whether the graphs can be used for determining temperature ratings because LaCarte, in fact, used them in this manner and believed they could be used. (*Therm. App.* Motion for Relief 0037; LaCarte Depo. 37:4-13).

There is also substantial evidence that BASF failed to exercise "reasonable care or competence in obtaining or <u>communicating</u>" information about the high-temp spray product to Thermacor.

BASF's own employees testified it was not BASF's practice to refer to its foam as "high-temp." (*Therm. App.* 0097-0098; Hyduk Depo. 117:19-118:13).

Hyduk testified that he [Hyduk] told Patterson not to refer to the foam as "high-temp," but Hyduk acknowledged that he knew Williams was representing to Thermacor that the foam was "high-temp" but never told Williams not to represent the foam to customers as "high-temp". (*Therm. App.* 0097-98; Hyduk Depo. 117:19-118:13).

There is also competent evidence to show that BASF did not use reasonable care or competence in transmitting the DMA and TGA graphs (referred to sometimes as the "data sheets"). These graphs were transmitted to Thermacor in an attempt to show Thermacor that the high-temp spray foam product met Thermacor's thermal stability requirements. (*Therm. App.* 0202-0207; *Therm. App.* 0071; Bender Depo., Vol. 1 43:5-15). This was done even though BASF had a policy not to distribute that data to customers (*Therm. App.* 0097-98; Hyduk Depo. 117-19-118:13).

As Bender testified, the "BASF salesman in the form of John Williams presented this information as – the data sheet as something that would do the job that we wanted." (*Therm. App.* 0071; Bender Depo., 43:20-23). These same data sheets accompanied the "it is done" email. (*Therm. App.* 0202-0207). However, BASF never told Thermacor what it has maintained in this lawsuit, *i.e.* the data sheets (TGA & DMA) are not reliable indicators of the thermal stability of the foam. (*BASF App.* Vol. I, 0234; Hyduk Depo., 78:4-9; *BASF App.* Vol. I, 0253;

Patterson Depo., 159:21-24) (Patterson agrees the temperature at which a particular [foam] system might be able to run <u>cannot</u> be determined by the DMA graph). Further, neither Patterson nor Williams was aware that the heat protocols had been changed by Gummaraju in a way that makes the foam appear more stable at a higher temperature than it actually was.    In fact, BASF showed behavior to the contrary regarding the DMA "uselessness" on two separate occasions; (1) Bender's email request for the foam's compressive strength in which Patterson answered that the information represented in the DMA is what Rick was asking for (*Therm. App.* 0324-25), and (2) In LaCarte's behavior described earlier where he actually rated foam using the DMA (*Therm. App.* Motion for Relief 0037; LaCarte Depo. 37:4-13).

There was sufficient summary judgment evidence to support a conclusion that BASF did not exercise reasonable care in transmitting this information because it never told Thermacor that the data sheets did not represent what they appeared to (*see generally, Therm. App.* 0206) (call out boxes on data sheets appearing to show that the foam begins to soften at 200.92 Centigrade) and what Williams at least implied that they did (*Therm. App.*  0202).   No where in the e-mails or in Thermacor's testimony was there any indication by BASF that the data sheets were useless to determine at which service temperature the foam could be used.    There is at minimum a fact issue as to whether BASF exercised

reasonable care in transmitting this information upon which Thermacor justifiably relied on. The evidence demonstrates a dispute that should have gone to a jury and the Motion for Summary Judgment on Thermacor's negligent misrepresentation claim should be reversed.

The trial court next found:

> The summary judgment record establishes that defendant provided a product that, based on defendant's testing, defendant <u>expected</u> would meet plaintiff's needs; but, <u>defendant made clear to plaintiff that plaintiff would be required to do its own testing</u> in order to determine whether the product in fact met those needs. Plaintiff accepted defendant's product subject to that requirement.

Op. at 11 (CR2, USCA5 428) (emphasis added). Again the use of the words "expected" and "subject to" appear to suggest that BASF established as a matter of law that it was selling the foam conditioned on Thermacor's testing. There are facts which indicate otherwise. The alleged condition, *i.e.* that the foam may or may not meet Thermacor's temperature requirements, was never communicated to Thermacor. Thermacor, like most companies interested in making a profit, would not purchase a product which it did not believe (because of BASF's representations) would meet its requirements. BASF told Thermacor "it is done," not "it *may* be done". (*Therm. App.* 0202).

Like other issues in this case, reference to the timeline of events is a helpful indicator of the positions of the parties at that time (as opposed to the positions

which BASF takes in hindsight). (*See,* Product Development Timeline, CR2, USCA5 309-310).

The facts would support the following conclusion. BASF had a spray foam that worked at 284°F. (*Therm. App.* 0293). Thermacor, as BASF was well aware, required a foam that worked to 366°F continuous with spikes to 400°F (*Therm. App.* 0005; Patterson Depo. 44:21-25).    After learning of Thermacor's requirements, BASF used the spring of 2004 to develop a foam with greater thermal stability. (CR2, USCA5 309-310).  After apparently meeting that goal, BASF told Thermacor "it is done" and anxiously attempted to bring the foam to Thermacor to test for application. (*Therm. App.* 0202).  Thermacor took testing for application to mean testing how the material worked in Thermacor's spray set up (*Therm. App.* 0038; Keyes, Jr., Depo. 62:23-25). Testing at Thermacor is costly and Thermacor would have no interest in testing a foam for application had it known that BASF had not even qualified the foam for temperature. (*BASF App.*, Vol. II 0310).  Only after the foam failed, has BASF backtracked and attempted to use its boilerplate documents to impute knowledge on Thermacor where had BASF merely told Thermacor up front, this entire problem may have averted.  (CR2, USCA5 255).

The trial court next found:

> The mere fact that defendant expressed optimism that it could develop a product that would satisfy plaintiff's needs does not constitute negligence.

Op. at p. 11. (CR2, USCA5 428).    Like the discussion immediately above, the term "optimism" suggests BASF was hedging its bets on the performance of the foam.  While this may have been true internally, this was never communicated to Thermacor.

> The trial court next found:

> The summary judgment record establishes as a matter of law that the development of a product that would satisfy plaintiff's needs was something in the nature of a <u>joint endeavor</u> between plaintiff and defendant, with defendant undertaking to develop such a product and with plaintiff making whatever tests were appropriate to ensure itself that the product in fact meet its needs.

Op. at pp. 11-12 (CR2, USCA5 428-29) (emphasis added).  As discussed above, the idea of a joint venture is completely without factual support.  This is a classic vendor-purchaser relationship.    The fact that Thermacor had to test the BASF product on its equipment to make sure the foam applied correctly (especially in light of the application problems with the Stepan product) did not convert it into a chemical company like BASF with the "joint" responsibility to ensure that the chemical properties of the foam would result in Thermacor's thermal stability requirements.

42

## Fraudulent Inducement

To establish fraudulent inducement under Texas law, plaintiff must show that defendant made a material representation that was false, that defendant knew the representation was false or made it recklessly without knowledge of its truth, and that the representation was intended to be acted on, was relied upon, and caused injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998).

Thermacor incorporates the arguments above because the Court appears to have used the facts relied upon interchangeably.

The trial court found:

> There is no summary judgment evidence that defendant "was aware that it was unable and incompetent to develop and manufacture the insulating materials with the properties required by [plaintiff]."

Op. at p. 13 (CR2, USCA5 430). In fact, there is summary judgment evidence that BASF was aware it was unable and incompetent to sell Thermacor a foam that met its requirements.

BASF admits it does not rate its foam for temperature. (*Therm. App.* 0007; Patterson Depo. 58:7-3). Without rating or otherwise determining the thermal stability of its foam, BASF was unable and incompetent to develop a foam to meet Thermacor's requirements of 366°F continuous with spikes to 400°F. BASF

claims that there are too many other factors which influence the thermal stability rating of the foam. (*Therm. App.* 0006; Patterson Depo. 45:4-8). Taking this as true, BASF was unable and incompetent to develop any foam which would meet a specific customer's thermal stability requirements.

The Court next found:

> As to the 'untried material in this particular application' feature of the fraudulent inducement allegations, the summary judgment record establishes that <u>both parties knew</u> the material developed by defendant for possible use by plaintiff was untried in plaintiff's particular application."

Op. at pp. 13-14 (CR2, USCA5 430-31) (emphasis added). There is a fact issue regarding (1) whether Thermacor knew that the #17071 product had not been tested for stability at the temperatures Thermacor required; and (2) who had the duty to determine whether this material would withstand those temperatures. It is Thermacor put on evidence that it did need to test for temperature resistance and it was never told to do so by BASF. BASF's Patterson and Williams came and tested for "application." In fact, the portion of evidence on which the trial court relies for its findings that BASF was pushing for temperature testing, only proves that BASF wanted to make sure its foam was suitable <u>for application</u>. *See,* Op. at p. 9, n. 6 (CR2, USCA5 426).

## DTPA

The Texas Deceptive Trade Practice Act, TEX. BUS. & COMM. CODE §17.41, *et. seq.,* prohibits an enumerated list of acts deemed to be deceptive trade practices. Among the specific acts prohibited by the statute, Thermacor alleged that BASF violated TEX. BUS. & COMM. CODE §17.46(b)(5) in that it represented that its high-temp spray-on foam had characteristics and uses it did not have, namely that it could remain stable at temperatures from 360°F up to occasional spikes of 400° F. Thermacor also alleged that BASF violated TEX. BUS. & COMM. CODE §17.46(b)(7) by representing that its product #17071 spray-on, high-temp foam was of a particular standard, quality or grade, when it, in fact, was of another, inferior grade (CR1, USCA5 107). The evidence discussed above establishes that BASF made representations about the thermal stability of the #17071 product that were not correct, and the court below did not address any causation or damage issues in its Memorandum Opinion. Thus, the disposition of the DTPA claims, even indirectly was erroneous.

The trial court does not substantively address Thermacor's DTPA claims, finding the "DTPA claims should summarily be dismissed for the same reasons the earlier-discussed claims are being dismissed." Op. at p. 15 (CR2, USCA5 432). Therefore, Thermacor incorporates the arguments above herein, and for the reasons

stated above, asks this Court to reverse and remand the Court's summary judgment on Thermacor's DTPA claim because there are fact issues regarding whether BASF represented that its product #17071 had properties or characteristics it did not have.

## Motion for Relief from Judgment

After the time for filing a Motion for New Trial had passed, Thermacor received the transcript of Chris LaCarte, a BASF employee, that had been taken in Canada a day before the trial court granted BASF's Motion for Summary Judgment. (CR2, USCA5 418-434). Because the major ground for the Motion for New Trial was the evidence believed to have been obtained through LaCarte's testimony, the transcript was needed to assure that his testimony was consistent with Thermacor's counsel's recollection. Thus, a Motion for Relief from Judgment under FED. R. CIV. P. 60(b) was required. Because the LaCarte testimony was new evidence, because it was not available to BASF before the time for filing a Motion for New Trial had passed, despite Thermacor's diligent efforts, and because it revealed significant fact issues arising out of the testimony of Patterson and Williams, a Motion for Relief from Judgment was required and the trial court's decision to overrule that motion was in error.

Rule 60(b)(2) of the Federal Rules of Civil Procedure provides that:

> On motion and just terms, the court may relieve a party or its legal
> representative from a final judgment, order, or proceeding for the
> following reasons: . . . (2) newly discovered evidence that, with
> reasonable diligence, could not have been discovered in time to move
> for a new trial under Rule 59(b); . . . .

FED. R. CIV. P. 60(b)(2). A movant bringing a motion under Rule 60(b)(2) must
demonstrate "(1) that it exercised due diligence in obtaining the information and
(2) the evidence is material and controlling and clearly would have produced a
different result if presented before the original judgment." *Provident Life and
Accident Ins. Co. v. Goel*, 274 F.3d 984, 999 (5th Cir. 2001) (citation and quotation
omitted). Thermacor's newly discovered evidence was the deposition of Chris
LaCarte, taken one day before the District Court granted BASF's summary
judgment, which is the subject of this appeal. (*Therm. App.* Motion for Relief
0001-0137). Despite requesting the immediate production of an expedited copy of
the deposition transcript, the court reporter, a Canadian citizen living in Calgary,
Alberta, Canada, where the deposition was taken, did not deliver the transcript
until February 28, 2008, well past the time for filing a Motion for New Trial.

The trial court found "Plaintiff is not entitled to any relief because it cannot
show that the newly discovered evidence, with reasonable diligence, could not
have been discovered in time to move for a new trial under Rule 59(b). Indeed,

47

plaintiff <u>did</u> discover the new evidence in time to move for a new trial."[3] (Supp. CR1, USCS5 13).

However, the "evidence" the Court claims Thermacor had could only be supplied through offering <u>the transcript</u> as evidence. Without the transcript, which did not arrive in time for Thermacor to move for a new trial, Thermacor had no "evidence" which would support its Motion for New Trial. Thermacor would have to rely on recollection, and would not have been able to cite sworn testimony. The trial court finds a distinction between the taking of the deposition and the receipt of the deposition as "unpersuasive", but without the actual transcript to attach to any motion, Thermacor is without evidence and is merely presenting argument. Further, counsel who took the deposition wanted simply to review it before submitting it in support of a post-trial motion to be sure that the testimony was as it was remembered and to be able to compare it to BASF's prior testimony.

If Thermacor cannot move for a new trial because it has no "evidence", *i.e.,* the transcript, and it cannot submit the transcript as "new evidence", as the trial court suggests, then it is left with no procedural mechanism to get the new evidence before the fact finder.

---

[3] Rule 59(b) of the Federal Rules of Civil Procedure provides that a motion for new trial must be filed no later than ten days after the entry of judgment. Excluding intermediate Saturdays and Sundays, and Washington's Birthday, plaintiff's motion for new trial would have been due on February 22, 2008. *See,* Fed. R. Civ. P. 6(a).

The Court next concluded that Thermacor "has not met the strict requirement of showing that the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment." (Supp. CR1, USCA 13). The Court first finds relevant "[LaCarte] was not involved in formulation, testing, design or communication with any of Defendant's other employees." (Supp. CR1, USCA5). The trial court cites the testimony of Williams and Patterson that not only directly involves LaCarte in the formulation of the foam sold to Thermacor, but also characterizes LaCarte as BASF's expert on high-temp foam. (Supp. CR1, USCA5 15-16). Notwithstanding the fact issues presented about where this formulation originated (Patterson and Williams say LaCarte, who in turn, testifies he knew nothing about the formulation), the trial court finds the new evidence does "not relate to what [BASF] represented to [Thermacor] . . . ". (Supp. CR1, USCA5 16).

Whether or not BASF was fraudulent or negligent in its promises to Thermacor, that it had a high-temp spray foam that met Thermacor's thermal stability requirements, does "relate" to the basis and/or foundation for its statements. Williams and Patterson testified that they contacted LaCarte in Canada because BASF USA did not have a U.S. product that met Thermacor's thermal stability requirements. LaCarte, however, unequivocally testified that he was not involved "at all" with the formulation, design, testing or any communications

related to the high-temp foam sold to Thermacor. (*Therm. App.* Motion for Relief 0056; LaCarte Depo. 55:5-56:2). If LaCarte was the expert relied upon by Williams and Patterson and LaCarte claims to have no knowledge about the product, the new evidence clearly creates a fact issue on the veracity of BASF's statements about the thermal stability of the foam.

The trial court then mistakenly concludes that Thermacor does not provide "any evidence as to purported representations made <u>before</u> the transaction ..." (Supp. CR1, USCA5 17). The involvement of LaCarte goes directly to the heart of the representations made before Thermacor decided to purchase the BASF high-temp spray foam. If Williams and Patterson did not rely on LaCarte's expertise, as LaCarte contends, for making representations about the heat-resistant properties of the high-temp spray-on foam product, and if LaCarte was not involved, then Williams and Patterson had no basis (as opposed to possibly merely being negligent) and therefore, committed fraud in promising Thermacor it had a spray foam that met Thermacor's thermal stability requirements.

"[T]he discretion of the district court is not unfounded, and must be exercised in light of the balance struck by Rule 60(b) between the desideration of finality and the demands of justice." *Seven Elves, Inc. v. Eskenazi*, 635 F. 21 396, 402 (5th Cir. 1981). That same consideration must inform appellate review of a district court's exercise of discretion under Rule 60(b); and where denial of relief

precludes examination of the full merits of the case, even a <u>slight</u> abuse may justify reversal." *Id.* (internal citations omitted) (emphasis added). LaCarte, who was withheld by BASF until the very end, offers testimony which clearly creates fact issues on Thermacor's claims based on BASF's misrepresentations and the Motion for Relief from Judgment should have been granted.

## CONCLUSION

The summary judgment evidence revealed a serious dispute. There was evidence supporting all of the elements of Thermacor's claims that BASF put in issue and that the District Court ruled upon. Among other fact issues, what the record shows are questions regarding what BASF told Thermacor about the physical properties of its high-temp spray-on foam product, what BASF told Thermacor about testing, what Thermacor understood about testing, how BASF sales personnel acquired the information about the product it sold to Thermacor, and how that information was created or delivered. With all of those questions presented and unanswered, this case should have gone to trial.

Thermacor Process, L.P. asks this Court to reverse the judgment of the Court below and remand this case for trial on the merits.

Respectfully submitted,

_____
STEPHEN L. TATUM
State Bar No. 19674500
J. FRANK KINSEL, JR.
State Bar No. 11488700
JOHN S. POLZER
State Bar No. 24042609
**CANTEY HANGER LLP**
2100 Burnett Plaza
801 Cherry Street, Unit #2
Fort Worth, Texas 76102
817-877-2800 (Telephone)
817-877-2807 (Fax)
ATTORNEYS FOR APPELLANT,
THERMACOR PROCESS, L.P.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 11,190 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(b) because this brief has been prepared in a proportionately spaced typeface using a 14-point font.

_____
Stephen L. Tatum

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing was served on counsel for

Appellee the ____2d____ day of June, 2008, via hand delivery, as follows:

George Parker Young
Thomas J. Williams
Josh Borsellino
Haynes and Boone, L.L.P.
201 Main Street, Suite 2200
Fort Worth, Texas 76102.

_____
Stephen L. Tatum